IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 16, 2025

## STATE OF TENNESSEE v. DECORY SANCHEZ SMITH

**Appeal from the Circuit Court for Montgomery County**
**No. CC-20-CR-647      Robert T. Bateman, Judge**

_____

### No. M2025-00056-CCA-R3-CD
_____

A Montgomery County jury convicted the Defendant, Decory Sanchez Smith, of first degree felony murder and attempted aggravated robbery. The trial court sentenced him to life plus ten years. On appeal, the Defendant asserts that: (1) the evidence is insufficient to support his convictions and (2) the trial court erred when it sentenced him by imposing a ten-year sentence for his robbery conviction and ordering consecutive sentencing. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and KYLE A. HIXSON, JJ., joined.

John D. Parker, Clarksville, Tennessee, for the appellant, Decory Sanchez Smith.

Jonathan Skrmetti, Attorney General and Reporter; Ryan Dugan, Assistant Attorney General; Robert J. Nash, District Attorney General; and Marianne L. Bell and Crystal Morgan, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION
### I. Facts
### A. Trial

This case arises from a shooting and robbery that occurred in January 2020, a result of which Desergio Taylor died. For these events, a Montgomery County grand jury indicted the Defendant and his co-defendant Marc Crowder for first degree felony murder and attempted aggravated robbery.

The case against both defendants proceeded to trial, and the parties presented the following evidence: The victim, who was thirty-two at the time of his death, was in an

apartment where he lived with his older brother, Andravious Taylor, at the time of the shooting. The victim sold marijuana from their apartment, and he was also a marijuana user. On January 15, 2020, Andravious Taylor planned to leave the apartment with some of his friends at around 6:00 or 7:00 p.m. The victim gave Mr. Taylor a 9-millimeter handgun. Mr. Taylor checked the weapon to ensure that there was a bullet chambered in it.

About five to ten minutes later, two men arrived at the apartment complex in a gray vehicle. They walked up the stairs, and Mr. Taylor, who was outside the apartment, asked them if they had a cigarette. He recognized one of the men as the Defendant, in part because the two used to work at the same location, and he knew him by the nicknames "Cali" or "L.A." The men said they did not have a cigarette and entered the apartment. Mr. Taylor followed them inside.

Inside, the victim, who was playing a video game, extended his right hand in greeting to the Defendant. The Defendant, who was farther inside the apartment than the other man who accompanied him, said "You know what this is," and then pulled a pistol from his hoodie and started shooting. Both men were armed, and the second man appeared to be carrying a revolver. After the Defendant started shooting at the victim, Mr. Taylor returned fire, shooting twice at the Defendant and the other man.

Mr. Taylor then left and ran across the street to get help. As he was running away, the two men came down the stairs, got back into their vehicle, and left. The Defendant was holding the other man, and Mr. Taylor assumed it was because the man had been shot. Mr. Taylor ran to a nearby apartment complex and used one of the resident's phones to call 911. Mr. Taylor, who still had possession of the 9-millimeter, which he said had jammed, left the gun in the resident's grill. He went back to his apartment to meet police, and he informed them where he had left his weapon.

Mr. Taylor agreed he was initially not forthcoming with police about where he got the 9-millimeter. He said that he identified a photograph of the Defendant in a photographic lineup shown to him by police.

During cross-examination, Mr. Taylor agreed that the Defendant had been to the apartment before. Mr. Taylor acknowledged some inconsistencies between his trial testimony and testimony he had given on previous occasions. Mr. Taylor agreed that the victim had a gun, but he said that he never saw the victim brandish the weapon. Mr. Taylor agreed that he followed the two men, who had come to purchase drugs, into the apartment and "secured" the only exit. He stood between the men and the door.

2

Alexander Torres testified and confirmed Mr. Taylor's account of what happened after the shooting. He saw Mr. Taylor running with the gun in his hand, coming toward him at his apartment. Mr. Taylor appeared "real scared" and was "shaking" and acted as if he were being chased. Mr. Taylor asked him to use the phone, and Mr. Torres allowed him into his kitchen. They called 911 from Mr. Torres cell phone, and while they waited for police to arrive, Mr. Taylor asked Mr. Torres if he could leave his weapon at the apartment. Mr. Taylor left the weapon on the grill and went back toward the apartment where the shooting occurred. Mr. Torres wrapped the weapon in a towel and placed it inside the grill until police arrived and retrieved the weapon. There was no magazine in the gun.

Several officers testified about responding to this shooting and the resulting investigation. Officer Christian Canales responded to this call on January 15, 2020, shortly after 6:35 p.m. Upon arrival, he heard people shouting behind the building, so he ran in that direction. He went to the apartment and found the door open. Inside, Officer Canales saw a Black man with multiple gunshot wounds slumped over on the couch. There was a lot of blood, and the victim appeared to be deceased, and when the officer touched him, he was lifeless. When he grabbed his arm to move him, a black Taurus pistol fell out of his grip where his hand was on his lap.

Officer Canales called for EMS and attempted to secure the apartment. Before it was secured, the victim's brother, Mr. Taylor, came running toward the apartment and darted frantically inside. The officer stopped Mr. Taylor who said repeatedly, "They shot him." He pointed in the direction from which he ran and said that the gun was "over there." The officer was unsure what gun Mr. Taylor was referring to because Mr. Taylor was so frantic. He removed Mr. Taylor from the apartment.

EMS arrived and found that the victim had a slight pulse, so they transported the victim to the hospital.

Officer Canales searched the area where Mr. Taylor had indicated and encountered Alejandro Torres, who told him that there was a gun inside his grill. He explained that Mr. Taylor came to his apartment earlier, "frantic" and asked to call 911. He then placed the gun on top of the grill. Mr. Torres was worried about neighborhood children, so he wrapped the gun in a towel and put it inside the grill.

Officer Corey Coleman responded to this shooting and saw Mr. Taylor pacing near the stairs of the apartment and then went up to the apartment where he saw the victim being treated by EMS personnel. EMS gave Officer Coleman the weapon that had been on the victim's lap, and he attempted to clear it. He noted that a casing had gotten caught in the

3

ejector port, so the gun had jammed. Officer Coleman attempted to retrieve the victim's identification from his pockets, and he found a large amount of cash, approximately $1,000.

Officer Kellie Belgarde identified multiple pieces of evidence and photographs of evidence, including the gun found in the grill and photographs of where the gun was found. Officer Belgarde also identified photographs and evidence taken from the crime scene, including of what appeared to be blood stains, swabs of the blood stains, shell casings, bullets, multiple other guns, and multiple cell phones. She also identified photographs of the Jeep Liberty believed to be driven by the Defendant and co-defendant and photographs of evidence found inside the Jeep, which included a cell phone, a hoodie, and a swab of what appeared to be blood on one of the seats.

Detective Allen Pendarvis responded to this shooting as part of the crime scene unit. When he arrived, he saw a nine-millimeter bullet as well as a metal magazine that contained additional bullets located in the parking lot in front of the stairwell.

Dr. Feng Li, the medical examiner, determined the victim's cause of death was multiple gunshot wounds. The gunshot wound to his forehead was created by a weapon that was approximately two to two and a half feet from him when fired. The right abdomen wound was a "distant, penetrating gunshot wound." Both wounds caused multiple injuries. The victim also had a superficial gunshot wound to his right thigh, a perforating gunshot wound to his left thigh, a gunshot wound to his left hip, and a superficial gunshot wound to his left, lower leg. Dr. Li opined that several of the victim's gunshots wounds were fatal, but the head wound and the wound to the right abdomen were the most serious.

Dr. Li said that she recovered a bullet from the victim's brain and another from his body. She retrieved both, as well as some bullet fragments. Dr. Li said that the victim's cause of death was multiple gunshot wounds and the manner of death a homicide. His bloodwork revealed he had consumed marijuana before his death, but she found it to be not significant to his cause of death.

Officer Michael Ulrey retrieved the clothing and shoes from the hospital of the victim, the Defendant, and co-defendant Crowder.

Alex Brodhag, a Tennessee Bureau of Investigation ("TBI") special agent, testified as an expert in firearms and tool mark examinations. He received three firearms to examine: a Sig Sauer P250 nine-millimeter pistol (found in the victim's lap); a Taurus 24/7 nine-millimeter pistol (found in a neighbor's grill); and a Jimenez .380-auto caliber pistol (found in a back bedroom of the apartment). All three guns worked normally when they were test fired, but Agent Brodhag acknowledged that it was possible for the casing to become stuck, causing the gun to jam when fired. Agent Brodhag said that the Taurus

4

pistol did not come with a magazine and that the magazine found later at the scene would work in the Taurus.

Agent Brodhag testified that all the shell casings found at the scene were fired from one of these three weapons. Two bullets found at the scene and two bullets found inside the victim's body were all fired from the same weapon, but none of these bullets were fired from any of the three weapons submitted.

Nathan Lee, who was a detective with the Clarksville Police Department at the time of this shooting, testified that the victim had already been transported to the hospital by the time he arrived. Detective Lee spoke with other officers and then became aware of Ricki Adkins, who was co-defendant Crowder's girlfriend. He spoke with Ms. Adkins and the victim's brother, Mr. Taylor, the night of the shooting. He showed Mr. Taylor a photographic line up from which he identified the Defendant's photograph as being of the shooter. Also, in the early morning hours after the shooting, Detective Lee retrieved a cell phone from Ms. Adkins. Detective Lee obtained DNA samples from the Defendant and co-defendant Crowder, who were both hospitalized with injuries sustained the night of the shooting.

Ms. Adkins testified that she and co-defendant Crowder were in a romantic relationship at the time of the shooting, and he lived with her. When he moved in with her and her three children, he brought a gun with him, which upset her. Co-defendant Crowder promised to keep the weapon "put up." Ms. Adkins recalled that, the day of the shooting, co-defendant Crowder worked half a day. The two then went to a car lot in search of a vehicle and purchased a silver Jeep Liberty. They returned home and co-defendant Crowder left in the new Jeep to pick up his friend.

About an hour later, co-defendant Crowder returned and honked the horn from outside. She went outside and saw the Defendant, whom she did not know, standing by the vehicle yelling. The Defendant told Ms. Adkins to take co-defendant Crowder to the hospital because he had been shot. When she got into the vehicle, co-defendant Crowder tried to hand her two guns, and she said "no." One gun was black semi-automatic, and one was silver and brown revolver. Co-defendant Crowder gave the guns to the Defendant, who got back out of the vehicle and put the weapons in her deep freezer.

Co-defendant Crowder told Ms. Adkins to say that he and the Defendant were in the "projects" and were the victims of a drive by shooting. She asked him what happened, and he said, "He tried to hit a licc . . . [and] [t]hat it went wrong." Ms. Adkins understood a "licc" to mean to rob someone. Co-defendant Crowder told Ms. Adkins to "get rid of the [the guns] or else" and then told her to take the weapons to "Cane" or "Trigger." Ms.

5

Adkins inquired about how the Defendant fared, and he said he had also been shot but that he was fine.

Upon arriving at the hospital, she informed staff that there were two men who were both shot in her vehicle. She went to park the Jeep, and law enforcement officers approached her. She took her and one of co-defendant Crowder's phones from the Jeep, leaving his other phone that he used to play music. Officers then transported her to the police station for questioning.

Police officers took the phone she had with her, which was co-defendant Crowder's phone, but she said it was hers. She also did not tell them about the guns at her house. She explained that she feared co-defendant Crowder.

Ms. Adkins said that her friend, Michelle, brought her home from the police station. When she returned home, she retrieved the guns and put them under her mattress. She then got a bag of drugs that co-defendant Crowder kept in the top of her closet and put the guns and the drugs in the same bag, which she then put in Michelle's car. They went to the location that co-defendant Crowder had indicated to give the guns to "Cane" or "Trigger," but neither were home. Ms. Adkins and Michelle went to Michelle's house where she spent the night. The next day, she gave the drugs to "Cane" or "Trigger" and the guns to a man named "Will."

Co-defendant Crowder called Ms. Adkins from jail, and she told him that the police had his phone. He told her that she needed to get it back. He told her to get rid of the guns, and she told him that she already had. Shortly thereafter, Ms. Adkins moved with her three children to Kentucky. There she was charged with tampering with evidence for disposing of the weapons. Law enforcement officers came to speak with her, and she told them that "Will," who lived on Chapel Street, had the guns. She did not, however, detail her involvement in giving him the weapons until a later interview.

Analysis of the victim's phone by a TBI special agent revealed text messages between someone named "Cory" and the victim referencing the purchase of marijuana on the day of the shooting. Analysis of co-defendant Crowder's phone showed text messages referencing his newly purchased Jeep. There were also text messages from a phone contact saved as "C. Real" that included plans to meet the evening of the shooting. "C. Real" indicated that he was on the way to co-defendant Crowder's house around 6:00 p.m. the night of the shooting. Co-defendant Crowder told a contact named "Wooo" by text that he had a "licc" later that evening, which was the night of the shooting. "Wooo" responds "for what," and co-defendant Crowder told him "[p]illows and cash."

Special Agent Gregory Fort, with the TBI and an expert in forensic biology, examined and compared the DNA evidence submitted in this case against the DNA samples from the victim, the Defendant, and co-defendant Crowder. The samples indicated that co-defendant's Crowder's blood was found on multiple locations around the apartment, including on the deck, landing and stairs. He also found co-defendant Crowder's blood on the clothing submitted from his hospital admission. Agent Fort found the victim's blood on the Defendant's right shoe, which was submitted from the Defendant's hospital admission.

Based upon this evidence, the jury convicted the Defendant of first degree felony murder and attempted aggravated robbery. The trial court sentenced him to life plus ten years.

## B. Sentencing

At the sentencing hearing, an officer reviewed the presentencing report. It showed that the Defendant had been placed on parole on December 5, 2018, and his parole was revoked as a result of this shooting. The Defendant had been serving a sixteen-year drug related sentence.

The trial court first noted that the Defendant's mandatory sentence for the first degree felony murder was life in the Tennessee Department of Correction. The applicable range for the attempted aggravated robbery conviction, a C felony, was three to fifteen years of incarceration, depending upon the appropriate sentencing range. The trial court found that the Defendant was a Range II Offender based upon his prior convictions, so his range was six to ten years.

The trial court found that the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range, that he was a leader in the commission of this offense, and also found that there were no applicable mitigating factors. It ordered him to serve ten years.

The trial court considered consecutive sentencing, and it found that Defendant qualified for consecutive sentencing because he was a dangerous offender, incorporating his findings against co-defendant Crowder. In those findings, the trial court stated:

> The Court does find that the Defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which risk of human life is high. The Court bases this upon the circumstances surrounding the commission of this offense as being aggravated and that confinement for an extended period of time is necessary

7

to protect society from the Defendant's unwillingness to live a productive life and the Defendant's resort to criminal activity. The Court finds that this sentence reasonably relates to the offense to which the Defendant stands convicted . . . .

The trial court further noted, as a particular fact, that the Defendant was on parole or other release program at the time this offense was committed.

It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that the evidence is insufficient to support his convictions and that the trial court erred when it sentenced him to ten years for attempted aggravated robbery and ordered consecutive sentencing. The State asks this court to affirm in all respects.

### A. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to sustain his convictions for first degree felony murder and attempted aggravated robbery. He offers a different interpretation of the evidence, saying that it showed that the Defendant intended to purchase marijuana from the victim but walked into an ambush. He asserts that the victim shot first, hitting both the Defendant and co-defendant Crowder. Co-defendant Crowder pulled out a revolver, which then landed on the couch because he was shot. The Defendant posits that Mr. Taylor grabbed the revolver and shot indiscriminately. He argues there is no proof that the Defendant fired a weapon. He contests the testimony of Mr. Taylor and Ms. Adkins and concludes that the evidence is therefore insufficient to sustain the jury's verdict. The State responds that the jury accredited the testimony of Mr. Taylor and Ms. Adkins and that the evidence is sufficient to sustain his convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct

evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not reweigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

First degree felony murder is defined as relevant here as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2). No culpable mental state is required for conviction of felony murder except the intent to commit the underlying felony. T.C.A. § 39-13-202(b).

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). A robbery is aggravated when it is "[a]ccomplished with a deadly weapon" or "[w]here the victim suffers serious bodily injury." T.C.A. § 39-13-402(a). Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. *Buggs*, 995 S.W.2d at 107. "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense" either "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part" or "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(2)-(3).

The evidence, viewed in the light most favorable to the State, showed that the Defendant and co-defendant Crowder arranged to meet the victim at his apartment. The victim expressed concern about the meeting and asked Mr. Taylor to assist with protection. Mr. Taylor was outside as the Defendant and co-defendant Crowder arrived at the apartment. He recognized the Defendant as someone with whom he used to work. Upon entering the apartment, the Defendant and co-defendant Crowder brandished weapons and told the victim "you know what this is." The victim, the Defendant, and co-defendant Crowder were all shot in the melee. The Defendant and co-defendant Crowder went to Ms. Adkins to ask for her to take them to the hospital, and co-defendant Crowder said he was trying to hit a "licc," which she and officers testified meant that he was attempting a robbery. DNA testing showed the victim's blood on the Defendant's shoe. This evidence is sufficient to support the Defendant's convictions.

As to the Defendant's specific contentions, calling into question the testimony of both Mr. Taylor and Ms. Adkins, "[q]uestions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Bland,* 958 S.W.2d at 659. By its verdict, the jury found those witnesses' testimony credible, and we cannot disturb that determination on appeal. The Defendant is not entitled to relief on this issue.

**B. Sentencing**

10

The Defendant next contends that the trial court abused its discretion when it sentenced him. He asserts that the term of ten years for attempted aggravated robbery was improper because the trial court sentenced him to the maximum sentence within the applicable range, which he posits is "unduly harsh and excessive." He further contends that the trial court erred when it ordered that his sentences run consecutively because it did not "go over all of the factors" enumerated in Tennessee Code Annotated section 40-35-115. The State counters that the trial court properly sentenced the Defendant to a within range sentence and that the record supports the sentence it imposed.

Sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a "presumption of reasonableness." *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.* at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

The misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from a trial court's sentencing decision. *Id.* A reviewing court should not invalidate a sentence on this basis unless the trial court wholly departed from the principles of the Sentencing Act. *Id.* So long as there are other reasons consistent with the purpose and principles of sentencing, a sentence within the appropriate range should be upheld. *Id.*

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and

11

contained in the presentence report. *See* T.C.A. § 40-35-210 (2019); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2019).

We conclude that the trial court properly sentenced the Defendant. The trial court considered the relevant principles and sentenced the Defendant to the mandatory sentence for the murder conviction and a within-range sentence for the attempted aggravated robbery conviction. The trial court applied enhancement factor (1), that the Defendant had a history of criminal convictions in addition to those necessary to establish his range. T.C.A. § 40-35-114(1) (2019). The presentencing report showed that the Defendant had previously been convicted of possession of cocaine and received a sixteen-year sentence, possession of 0.5 grams or less of cocaine, a five-year sentence, reckless endangerment with a deadly weapon, a year and a month sentence, possession of 0.5 grams or less of cocaine, a four-year sentence, and theft of less than $500, a ten-day sentence. These convictions support the trial court's application of enhancement factor (1). The Defendant cannot show that the trial court wholly departed from sentencing principals when sentencing the Defendant to the maximum sentence within his range. The Defendant is not entitled to relief as to this issue.

As for consecutive sentencing, where a defendant is convicted of one or more offenses, the trial court has discretion in determining whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a). "[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the categories in Code section 40-35-115(b). This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *Pollard*, 432 S.W.3d at 861.

When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. §§ 40-35-102(1), -103(2), -103(4); *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Pollard*, 432 S.W.3d at 862 (citing Tenn. R. Crim. P. 32(c)(1); *Bise*, 380 S.W.3d at 705).

12

As relevant to this case, the trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that a defendant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]" T.C.A. § 40-35-115(b)(4). Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *State v. Wilkerson*, 905 S.W.2d 933, 937-39 (Tenn. 1995). "The adoption of the abuse of discretion standard with the presumption of reasonableness has not eliminated this requirement." *Pollard*, 432 S.W.3d at 863. To limit the use of the "dangerous offender" category to cases where it is warranted, the trial court must make specific findings about "particular facts" which show that the *Wilkerson* factors apply to the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

We observe no error or inadequacy in the trial court's analysis or findings. The trial court made the requisite *Wilkerson* findings and cited as a particular fact that the Defendant was on parole at the time that he committed these offenses. The Defendant is not entitled to relief.

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.


      _S/ ROBERT W. WEDEMEYER_
ROBERT W. WEDEMEYER, JUDGE

13